## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI

RICKY KIDD,

             Plaintiff,

    v.

CITY OF KANSAS CITY, MISSOURI,

and

KANSAS CITY, MISSOURI BOARD OF
POLICE COMMISSIONERS, through its
individual members, MARK TOLBERT,
CATHY DEAN, DON WAGNER, QUINTON
LUCAS, and DAVID KENNER, in their
individual and official capacities as members
of the KANSAS CITY, MISSOURI BOARD
OF POLICE COMMISSIONERS,

and

Officers GEORGE BARRIOS, DAVID
BERNARD, KENT MORTON, JAY
PRUETTING, RONALD RUSSELL, and JAY
THOMPSON, in their individual and official
capacities,

             Defendants.

Civil Action No.

**COMPLAINT &
JURY DEMAND**

 

Plaintiff Ricky Kidd, by and through his attorneys, the law firms of Neufeld Scheck &

Brustin, LLP, and Lathrop GPM LLP, hereby alleges as follows:

### INTRODUCTION

1.     Plaintiff Ricky Kidd ("Kidd") spent over two decades wrongly imprisoned for the

February 6, 1996, double murder of George Bryant and Oscar "Junior" Bridges in Kansas City,

Missouri—crimes he did not commit.

2.      Gary Goodspeed Sr. (sometimes herein referred to as "Sr."), a ruthless killer and a drug dealer, hatched a plan to rob George Bryant, a big-time drug dealer who was dating Goodspeed Sr.'s ex-wife. On February 6, 1996, Goodspeed Sr., assisted by his son Goodspeed Jr. (sometimes herein referred to as "Jr.") and Jr.'s cousin Marcus Merrill, murdered Bryant and Bridges, a handyman working in the Bryant house. Kayla Bryant, Bryant's four-year-old daughter, was at home and witnessed the crime.

3.      Ricky Kidd had no involvement in the murders of George Bryant and Oscar Bridges: he was not present, nor did he participate in any way. While Goodspeed Sr. brutally gunned down Bryant and Bridges, Kidd was constantly with his then-girlfriend, running errands, babysitting his infant nephew, and walking into a police station to fill out an application to permit him to lawfully purchase a handgun. He is innocent.

4.      Although she was only four years old, Kayla was able to provide the police with an accurate and detailed description of the crime and the perpetrators. Four days after the murder, she was shown a "mug" show up folder—otherwise known as a photo array—that included photographs of Goodspeed Jr., Merrill, and Kidd. This photo array was created based on anonymous phone calls naming various individuals as suspects in the double murder, including the true perpetrators, but also several other men who were not involved, including Kidd. Kayla accurately identified Marcus Merrill as the person who shot her father. She did not, however, identify Ricky Kidd.

5.      Defendants[1] also developed evidence via anonymous phone calls that a man named Richard Harris had information about the crimes. Harris was a wholly unreliable and motivated

_____

[1] Throughout this Complaint, "Defendants" or "Individual Defendants" refers to the individual Defendant officers George Barrios, David Bernard, Kent Morton, Jay Pruetting, Ronald Russell, and/or Jay Thompson, unless otherwise specified.

2

witness: he was on parole for drug dealing, was using and dealing drugs the morning of the crime, and was seeking reward, either in the form of money or leniency on his charges, in exchange for information. He provided Defendants an alleged account of witnessing the crime that was implausible on its face and wildly inconsistent with the consistent accounts detectives had received from other witnesses.

6.      Despite Harris' obvious credibility issues, Defendants showed Harris a videotaped lineup that included Kidd. Harris, who wanted to provide information, identified Kidd as the shooter. Harris' incredible account of how he allegedly recognized Kidd—he claimed the shooter had a distinctive "Terminator" walk—was as unreliable as his dramatic account of witnessing the crime.

7.      Even though Kayla had, within days of the crime, viewed a photo of Kidd and stated unequivocally that she did *not* recognize him as one of the perpetrators, and even though Kidd had, at this point, provided a detailed and credible alibi for the time of the crime, Defendants reported that, two months after the crime, they showed Kayla a videotaped lineup of Kidd, and later falsely reported that Kayla had made a compelling and theatrical identification of Kidd.

8.      Kidd and Merrill were arrested and charged with the double murder. Kidd truthfully told Defendants he was innocent. He and his family volunteered detailed information about his whereabouts and—despite fear of retaliation—that the Goodspeeds and Merrill had committed these murders.

9.      But with Kidd and Merrill in custody, Defendants buried their heads in the sand. They purposefully ignored and failed to investigate evidence pointing to the Goodspeeds, including to Goodspeed Sr.—a drug dealer with a violent reputation who had prior convictions for homicide, robbery, and larceny; with personal and pecuniary motive to confront and rob Bryant; whose

3

fingerprint police identified in the suspect vehicle; and who told police he was with Goodspeed Jr. and Merrill on the day of the murder and never saw Kidd at all that day.

10.     Instead, Defendants focused on Kidd, who had no convictions at the time of the crime, provided Defendants with a credible alibi, and volunteered to participate in the videotaped lineup that would later be used to, among other things, fabricate a false identification from Kayla. Defendants also purposefully ignored evidence suggesting his innocence, including a printout for his gun permit application dated the day of the crime, and the fact that none of the several pairs of his shoes Defendants collected matched bloody footprints found at the crime scene.

11.     Kidd was tried jointly with co-defendant and true perpetrator Merrill. At trial, eyewitness Kayla did not identify Kidd, who was seated in the courtroom, as one of the suspects present at her house the day her father was killed. Kayla did not identify Kidd because he was never there—he is innocent. Unable to secure an in-court identification from Kayla, the prosecutor relied upon Defendants' fabricated written and verbal reports to introduce evidence about Kayla's alleged identification.

12.     The case against Kidd rested on a weak foundation: an alleged out-of-court identification by a four-year-old witness and an in-court identification by Harris, a parole absconder. No physical or forensic evidence ever linked Kidd to the crime. Kidd truthfully maintained his innocence and, unlike Merrill, testified in his own defense. Kidd also presented five alibi witnesses who testified consistently and credibly to his whereabouts throughout the day of the crime.

13.     Kidd and Merrill were convicted for the murders of Bryant and Bridges, and Kidd was ultimately sentenced to life imprisonment without the possibility of parole for each count of first-degree murder. Throughout his wrongful incarceration, Kidd consistently maintained his

innocence, filing numerous appeals and post-conviction petitions, including a petition for writ of habeas corpus in state court that ultimately led to his exoneration. Over two decades, Kidd uncovered additional evidence that the police ignored or otherwise failed to develop during their investigation.

14. On August 14, 2019, Daviess County Associate Circuit Court Judge Daren Adkins granted Kidd's petition for habeas relief, vacated Kidd's convictions, and ordered a new trial. Kidd was released from custody on August 15, 2019, and on September 13, 2019, the Jackson County Prosecutor's Office dismissed the charges.

15. Ricky Kidd is innocent. He spent 23 years in prison for the Goodspeeds' and Merrill's crimes. For him, this nightmare experience "was like standing in a crowded plaza screaming you're innocent, but no one is listening and keeps passing you by." He now brings this federal lawsuit to hold the individuals who caused his wrongful conviction—and enabled two killers to escape justice for their crimes—accountable.

## JURISDICTION AND VENUE

16. This action is brought pursuant to 42 U.S.C. §1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution. This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

17. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a).

18. Venue is proper in the Western District of Missouri under 28 U.S.C. § 1391(b) in that this is the District in which the claims arose.

**JURY DEMAND**

19.     Plaintiff demands a trial by jury on all issues and claims set forth in this Complaint, pursuant to the Seventh Amendment of the U.S. Constitution and Federal Rule of Civil Procedure 38(b).

**PARTIES**

20.     Plaintiff **RICKY KIDD** was, at all times relevant to this Complaint, a resident of the State of Missouri. In March 1997, Kidd was wrongfully convicted of the murders of George Bryant and Oscar "Junior" Bridges and, as a result, served 23 years in prison. Kidd was finally released from prison in August 2019 and the Jackson County Prosecutor's Office dismissed all charges in September 2019.

21.     Defendant **CITY OF KANSAS CITY, MISSOURI** is, and at all times relevant to this Complaint was, a municipality located in the State of Missouri. The City of Kansas City, Missouri is, and at all times relevant to this Complaint was, responsible for establishing overall policy, overseeing operations, supervising, and otherwise employing the KCPD and its members, law enforcement officers, and agents. The City of Kansas City, Missouri was, at all times relevant to this Complaint, the employer of the individual Kansas City, Missouri Police Department (KCPD) Defendants in this matter.

22.     Defendant **KANSAS CITY, MISSOURI BOARD OF POLICE COMMISSIONERS** ("the Board") is responsible for providing police services to the residents of Kansas City, Missouri as mandated by Missouri statute. The Board is the governing body with the responsibility and duty of overseeing the actions of the Kansas City, Missouri Police Department and its officers.

23.     The Board has the power pursuant to Missouri statute and, upon information and belief, did in fact provide and contract for liability insurance coverage for officers and employees of the

police department, insuring liabilities incurred during the performance of duty and in the scope of employment for the police department.

24.    The Board is given its authority pursuant to Missouri statute and can sue and be sued by and through its members, **MARK TOLBERT, CATHY DEAN, DON WAGNER, QUINTON LUCAS, and DAVID KENNER,** in their respective individual and official capacities. The Board and its members are liable for damages caused by their respective employees and officers' intentional, wrongful, reckless and negligent acts, errors and/or omissions while the employees and officers were acting under color of state law and while they were acting within the course and scope of their employment with the Board and its members.

25.    Defendant **GEORGE BARRIOS**, at all times relevant to this Complaint, was an officer of the KCPD acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Kansas City, Missouri, the Board, and the KCPD. He is sued in his individual and official capacities. Barrios was assigned as a detective with the Homicide Unit at the time of this investigation.

26.    Defendant **DAVID BERNARD**, at all times relevant to this Complaint, was an officer of the KCPD acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Kansas City, Missouri, the Board, and the KCPD. He is sued in his individual and official capacities. Bernard was assigned as a sergeant with the Homicide Unit at the time of this investigation.

27.    Defendant **KENT MORTON**, at all times relevant to this Complaint, was an officer of the KCPD acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Kansas City,

Missouri, the Board, and the KCPD. He is sued in his individual and official capacities. Morton was assigned as a sergeant with the Homicide Unit at the time of this investigation.

28.     Defendant **JAY PRUETTING**, at all times relevant to this Complaint, was an officer of the KCPD acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Kansas City, Missouri, the Board, and the KCPD. He is sued in his individual and official capacities. Pruetting was assigned as a detective with the Homicide Unit at the time of this investigation.

29.     Defendant **RONALD RUSSELL**, at all times relevant to this Complaint, was an officer of the KCPD acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Kansas City, Missouri, the Board, and the KCPD. He is sued in his individual and official capacities. Russell was assigned as a detective with the Homicide Unit at the time of this investigation.

30.     Defendant **JAY THOMPSON**, at all times relevant to this Complaint, was an officer of the KCPD acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Kansas City, Missouri, the Board, and the KCPD. He is sued in his individual and official capacities. Thompson was assigned as a detective with the Homicide Unit at the time of this investigation.

31.     At all times relevant to this Complaint, the individual Defendant Officers named above acted in concert and in conspiracy with one another in order to deprive Kidd of his constitutionally protected rights.

32.     Defendant **MARK TOLBERT** is the President of the Kansas City, Missouri Board of Police Commissioners. He is sued in his individual and official capacities.

8

33.     Defendant **CATHY DEAN** is the Vice President of the Kansas City, Missouri Board of Police Commissioners. She is sued in his individual and official capacities.

34.     Defendant **DON WAGNER** is the Treasurer of the Kansas City, Missouri Board of Police Commissioners. He is sued in his individual and official capacities.

35.     Defendant **QUINTON LUCAS** is a Member of the Kansas City, Missouri Board of Police Commissioners. He is sued in his individual and official capacities.

36.     Defendant **DAVID KENNER** is the Secretary/Attorney of the Kansas City, Missouri Board of Police Commissioners. He is sued in his individual and official capacities.

37.     Upon information and belief, all Defendants are insured by one or more policies of liability insurance purchased pursuant to Mo. Rev. Stat. §§ 537.610, 71.185, 84.420 or other applicable state law with respect to all acts and omissions complained of herein.

## FACTUAL ALLEGATIONS

### Ruthless killer Gary Goodspeed Sr., assisted by his son Gary Goodspeed Jr. and Marcus Merrill, murders George Bryant and Oscar Bridges on February 6, 1996.

38.     On February 6, 1996, convicted killer Gary Goodspeed Sr. gunned down drug dealer George Bryant at Bryant's Kansas City home. Goodspeed Sr. also shot and killed Oscar Bridges, a handyman present in Bryant's home.

39.     Goodspeed Sr. was widely feared, with a reputation as a big hitter and a ruthless killer not to be crossed; it was rumored he had committed other murders, including that of his own best friend.

40.     Goodspeed Sr., also a drug dealer, had animosity towards Bryant, perhaps because Bryant was dating Goodspeed Sr.'s ex-wife. Although Goodspeed Sr. was living in Atlanta, Georgia, at the time, he planned a trip to Kansas City and decided to exact revenge on Bryant.

9

41.     In early February, just days before the murder, Goodspeed Sr. flew from Atlanta to Kansas City, accompanied by his son, Gary Goodspeed Jr. Marcus Merrill, Jr.'s cousin, had also flown from Atlanta to Kansas City a few days before the Goodspeeds.

42.     Merrill and Goodspeed Jr. visited Bryant's house on February 2 or 3, 1996—the Friday or Saturday before the double murder—and Jr. saw Bryant again at least one other time before February 6. Goodspeed Jr. had first met Bryant around the time Bryant started dating Jr.'s mother, Goodspeed Sr.'s ex-wife. Goodspeed Jr. and Bryant were so close, in fact, that Bryant, who was like a father to Goodspeed Jr., referred to Goodspeed Jr. as his "little brother."

43.     In the days and hours leading up to the double murder on February 6, the Goodspeeds and Merrill discussed in front of others their plan to confront and rob Bryant, who was known to carry large amounts of money and conduct substantial drug deals.

44.     On the morning of February 6, the three men rendezvoused at the home of Eugene Williams, Merrill's friend. The Goodspeeds and Merrill stopped at a "Good to Go" convenience store near Bryant's house, where Goodspeed Sr. bought duct tape and lip balm.

45.     At approximately 11:30 a.m., the Goodspeeds and Merrill arrived at Bryant's home at 7009 Monroe Avenue in a new, white, four-door 1995 Oldsmobile Cutlass Ciera.

46.     Kayla Bryant, Bryant's four-year-old daughter, was at home, sitting in the living room watching television. She heard someone ring the front doorbell and saw their white car through the window.

47.     After George Bryant opened the garage door, Kayla saw the two men—Goodspeed Sr. and Merrill—enter the kitchen, where her father and Bridges, who was doing construction work on the house, were located.

48. The men were dressed in black coats, wearing black stocking caps, and each was armed with a gun. Kayla had also seen Merrill at her dad's house days earlier.

49. Goodspeed Sr. pointed his gun at Bryant and said, "Give it up."

50. Kayla heard her father say, "Don't shoot me, man," and saw him with his hands up.

51. She then heard a shot. Goodspeed Sr. had shot her father. She peeked into the kitchen, and saw her father fall to the floor and wriggle around.

52. Kayla heard Bridges say "Man, I'm just here working on the basement," as he ran downstairs, followed by Goodspeed Sr.

53. Kayla saw Merrill search Bryant's pockets and rummage through cupboards and drawers. The Goodspeeds and Merrill ultimately robbed Bryant of money and nine ounces of cocaine.

54. In the basement, Goodspeed Sr. bound Bridges with the duct tape he recently purchased, and then shot him twice in the back of the head, execution style.

55. Bryant then got up and rushed Merrill, whose gun went off, shooting Bryant in the shoulder.

56. As Bryant ran outside through the garage door, Goodspeed Jr. tackled him in the yard. His father Goodspeed Sr. then walked up to Bryant and shot him in the back of the head.

57. As Merrill prepared to get in the car, Goodspeed Sr. ordered Merrill to "do something" about Kayla, who had seen him.

58. Although Merrill interpreted Sr.'s statement to be an order that Merrill kill Kayla, he did not want to kill the four-year-old. Instead, Merrill went back into the house, told Kayla "It would be alright," and shot a bullet in the wall.

59. The three men left the crime scene, driving northbound on Monroe Street in the white 1995 Oldsmobile Cutlass Ciera.

11

60.     The body of George Bryant was found lying in a pool of blood atop snow-covered grass near his house. He had multiple gunshot wounds, including to the head. The body of Oscar Bridges was found in Bryant's basement, with his feet, hands, and mouth bound with duct tape. He had been shot twice in the back of his head.

### Ricky Kidd is innocent of the George Bryant and Oscar Bridges murders.

61.     Ricky Kidd had no involvement in the murders of George Bryant or Oscar Bridges: he was not present nor did he participate in any way. He is innocent.

62.     At the time of the double murder, Kidd was driving with his then-girlfriend Monica Gray and his sister Nikki Kidd's two-year-old son to pick up the car his sister had borrowed that morning to go to work.

63.     Kidd entered his sister's office building sometime between 11 and 11:30 a.m. Kidd picked up the keys to his car, and then he and Gray drove the two cars back from downtown Kansas City to their apartment on 701 East Armour Boulevard.

64.     Kidd then drove to the Jackson County Sheriff's Office at Lake Jacomo with Gray and his nephew to apply for a gun permit, stopping at a McDonald's to get lunch for Kidd's nephew. They got lost along the way, but ultimately reached the sheriff's office.

65.     Kidd entered the office and filled out the application, and a dispatcher ran a check on his records at 1:47 p.m.

66.     In the time before, during, and after these brutal executions, Kidd was constantly with his then-girlfriend, running errands, babysitting his infant nephew, and walking into a police station to fill out an application to permit him to lawfully carry a handgun.

**The Kansas City, Missouri Police Department respond to the crime scene and interview several witnesses, including four-year-old eyewitness Kayla Bryant.**

67.     Kayla waited until the shooters left, watching them drive away in their white, four-door car, before calling 911 to report "Somebody killed my daddy."

68.     The first responding officer found Kayla standing in the garage door still on the phone with the 911 dispatcher. She had made the call at 11:53 a.m., which, along with two other 911 calls made around the same time, led detectives to place the time of this double murder at approximately 11:30 a.m.

69.     Several detectives, including Defendants Jay Pruetting, Ronald Russell, and Jay Thompson, arrived on the scene.

70.     Police and detectives on the scene quickly developed a description of the suspects and suspect vehicle based on witness interviews: three Black males wearing black and who drove a clean, white, four-door Oldsmobile Cutlass Ciera.

71.     Defendant Thompson and crime scene technicians processed the residence, the victims, and Bryant's cars.

72.     KCPD officers collected several items of physical and forensic evidence from the crime scene, including a piece of flooring with a bloody partial shoe impression, a piece of bread with a shoe impression, 30 fingerprint cards, bullet casings, and various blood and hair samples.

73.     That same day, Defendant Pruetting transported George Bryant's wife, Constance ("Connie") Bryant, and Kayla to police headquarters where he interviewed both of them.

74.     Although she was only four years old, Kayla was able to provide an accurate and detailed description of the crime and the perpetrators.

13

75.     At the scene, she told the first responding officer that two suspects left in a clean, white, four-door vehicle. In fact, the Goodspeeds and Merrill drove away in a recently rented, new, white 1995 Oldsmobile Cutlass Ciera.

76.     Kayla told Defendant Pruetting the men wore black hats and coats. In fact, they wore black stocking caps and black coats.

77.     Kayla described the two men to Defendant Pruetting as "skinny" and "fat": Goodspeed Sr. was 5 feet 9 inches tall and weighed 155 pounds; Merrill was 5 feet 9 inches tall and weighed 170 pounds.

78.     Kayla told Defendant Pruetting that "Daddy's brother shot daddy." She would later explain "Daddy's brother shot daddy, but it wasn't Daddy's brother." In fact, she had seen Goodspeed Sr., the father of Goodspeed Jr. Bryant referred to Jr. as "little brother," and Goodspeed Sr. and Jr. were a similar height and weight (Goodspeed Jr. was 5 feet 10 inches tall and weighed 141 pounds) and looked similar—as father and son tend to.

79.     Kayla also told Defendant Pruetting that the men who shot her father had come to her house the day before the shooting when Bryant's uncle was there. In fact, Goodspeed Jr. and Merrill had come to the house a few days before the crime, and Goodspeed Jr. would later tell police that Bryant's uncle was present.

80.     Kayla recounted to Defendant Pruetting how one of the suspects told her she would be alright. In fact, as Merrill has confirmed, he had told Kayla "it would be alright" before leaving the house.

**The KCPD create an improper photo array based on anonymous calls.**

81.     In the days that followed this double murder, it became clear to the KCPD that numerous witnesses claimed to have information about the crime, but many were, for various reasons, unwilling to speak to the police.

82.     The KCPD received several anonymous phone calls naming various individuals as suspects in the double murder, including true perpetrators Gary Goodspeed Jr., Gary Goodspeed Sr., and Marcus Merrill, as well as several other men who were not involved: Andre Bryant, Charles Wills, Reginald Rhodes, and Ricky Kidd.

83.     Based on names provided in anonymous phone calls, detectives created the following "mug" show up folder, or photo array, that included six Black males—Goodspeed Jr. (#2), Merrill (#3), Reginald Rhodes, Kidd (#5), and two fillers.



84.     According to well-established police procedures, a photo array should include only one suspect and a minimum of five fillers—that is, individuals the police know were not involved in the crime. A photo array must contain these clearly "wrong" answers to provide a meaningful test that the witness is identifying someone they remember, as opposed to merely guessing. This principle was widely understood by police departments prior to 1996.

85.     This improper six-person "mug" show up folder with four suspects and two fillers was the main photo showing used throughout the homicide investigation.

**Kayla Bryant accurately identifies Marcus Merrill as the person who shot George Bryant, but does not identify Ricky Kidd for the double murder.**

86.     On February 10, 1996, four days after the murder, Defendant Ronald Russell and Detective Robert Guffey interviewed Connie, George Bryant's wife, with Kayla present about Bryant, his associates, and his drug dealing activity.

87.     Before showing anyone the "mug" show up folder, and in accordance with proper police procedure to avoid witness contamination, Guffey took Kayla into another room.

88.     Guffey showed Kayla the "mug" show up folder, which included the photos of Merrill, Kidd, Goodspeed Jr, Rhoades, and two others.

89.     Guffey asked Kayla if "she sees anyone in the photographs, as being at her house the day that her father was killed."

90.     Kayla "immediately pointed" to photograph #3, which was of Merrill, and stated "#3 he killed my daddy, I remember his face." That was accurate—Kayla had seen Merrill at the house and had seen him shoot her dad in the shoulder.

91.     When Guffey asked if she recognized anyone else in the array—which included Ricky Kidd—as being in the house, Kayla answered "no." Kayla's failure to identify Kidd was also accurate; Kidd was not present during the murder of her father, nor had she met him before.

92.     Though Kayla said she saw two men, and Goodspeed Sr.'s name had, like Kidd's, been named in anonymous calls, Defendants did not show Kayla a photograph of Goodspeed Sr.

93.     Goodspeed Sr. had a darker complexion than Kidd. Kidd was also 50 pounds heavier and half-a-foot taller than Goodspeed Sr. In fact, Kidd was taller and heavier than either Goodspeed Sr. or Merrill; if Merrill was the "fat one," as Kayla would later explain, Ricky Kidd could not credibly be the "skinny" other perpetrator Kayla saw.

94.     Guffey returned Kayla to the room with Defendant Russell and her mother, Connie.

17

95.     Guffey reported that Kayla then asked if she could see the photographs, pointed to photograph #3 (Merrill), and stated again "he killed my daddy."

96.     Connie asked Kayla if she recognized photograph #2 (Goodspeed Jr.) and Kayla shook her head no; Connie indicated she thought Kayla did not recognize Goodspeed Jr. because the photograph used was not an accurate likeness.

**Although Ricky Kidd is innocent, he learns of evidence implicating the Goodspeeds and Marcus Merrill but is at first hesitant to share it out of fear of violent retaliation.**

97.     At the time of the Bryant and Bridges murders, Ricky Kidd was planning to start a life together with his then-pregnant girlfriend, Monica Gray.

98.     He had recently purchased a three-year-old Corolla to serve as a more reliable form of transportation than his 15-year-old Oldsmobile and was hoping to take college classes.

99.     Though he was a small-time drug dealer, Ricky Kidd was not a violent man. At the time of the crime, he had had no convictions.

100.     He and this then-girlfriend lived in a "kind of rough neighborhood" that had had a few break-ins, and his girlfriend was nervous. Kidd planned to purchase a gun for protection, had picked out the .357 revolver he wanted, and was in the process of obtaining a permit that would allow him to lawfully complete the purchase.

101.     Kidd knew George Bryant and Bryant's wife Connie. Kidd and Bryant were not close, but they had interacted and were on friendly terms.

102.     Though Kidd grew up with the Goodspeeds—he and Goodspeed Jr. were born six months apart and were friends as kids—by the mid-1990s, Kidd was distancing himself from Sr. and Jr., as their lifestyles, including Jr.'s heavy drug use, did not match his. By 1996, Kidd had fallen out with both Goodspeed Sr. and Jr. and was not on speaking terms with either.

18

103.    Then, out of the blue, in early February 1996, Goodspeed Sr. reached out to Kidd, notifying Kidd he was in Kansas City from Atlanta. Given Goodspeed Sr.'s reputation for violence and revenge, Kidd did not feel he could turn down the request and met up with Goodspeed Sr. at the Adam's Mark Hotel where Sr. was staying.

104.    There, Goodspeed Sr. tried to recruit Kidd to take on George Bryant, whom Sr. described as "loaded." Kidd understood Goodspeed Sr. had some sort of illicit plan—either he wanted assistance with robbing Bryant, or he was attempting to set Kidd up for something—and Kidd declined and left as soon as he could.

105.    Kidd shared what had happened with Gray.

106.    Kidd did not see Goodspeed Jr. or Marcus Merrill that week, and he did not meet any of them at any other point until after Bryant's murder.

107.    When Kidd learned that Bryant had been killed, he was terrified. He assumed Goodspeed Sr. must have been behind it, and that Goodspeed Sr. would view him as a potential witness.

108.    To make matters worse, Goodspeed Sr. again reached out to Kidd soon after the crime, asking Kidd to come over to a house where he was staying.

109.    Out of fear of refusing Goodspeed Sr. and in the hopes of convincing Goodspeed Sr. he was not a threat, Kidd went to the house, but asked Gray to wait in the car and keep it running in case they needed to escape.

110.    Goodspeed Sr. openly admitted to Kidd that he, Goodspeed Jr., and Merrill were responsible for the murders and told Kidd that he knew Kidd knew as well.

111.    Kidd then faked a phone call to leave, and Gray later knocked at the door, which gave Kidd an opening to get out.

19

112.     As they were leaving, Goodspeed Sr. asked Kidd if he had a car Sr. could borrow. Kidd, nervous to cross Sr., truthfully told Sr. that he could not help because his white Oldsmobile Delta was broken down and parked at the back of his mother's place, 701 East Armour Boulevard.

113.     Concerned for their safety, Kidd and Gray decided to accelerate their plans to move out of their apartment and neighborhood.

114.     Kidd had promised Gray they would move out of their neighborhood, a promise he tried to fulfill on Valentine's Day, February 14.

**The KCPD question Ricky Kidd based on anonymous phone calls.**

115.     On February 13, 1996, the KCPD received an anonymous phone call from a Black male who claimed to have called on two prior occasions, informing them that the suspect vehicle the Homicide Unit was searching for—a white Oldsmobile Cutlass—was parked behind 701 East Armour Boulevard, the apartment complex where Kidd's mother, as well as Kidd and Gray, lived.

116.     On information and belief, at least some of these calls was made by or on behalf of Goodspeed Sr.

117.     Goodspeed Sr. knew that Kidd had information implicating the Goodspeeds and Merrill in the crime, and that Kidd feared him. He also knew that the police were looking for a white four-door Oldsmobile (the suspect-vehicle description was broadcast on the radio) and where Kidd parked his white Oldsmobile Delta—because Kidd had told him about his car days prior.

118.     With motive and opportunity, Goodspeed Sr. sought to falsely implicate Kidd to divert suspicion from himself, his son, and Merrill.

119.    This tip, however, was demonstrably false—Kidd had two cars at that location, a black or dark gray Toyota Corolla and a white 1981 Oldsmobile *Delta*, not an Oldsmobile *Cutlass*, and certainly not the clean, new vehicle witnesses described at the crime scene.

120.    The police learned this information the next day, on February 14, 1996, when, based on that tip, KCPD officers stopped Kidd, Gray, and Paul Atkinson (one of Kidd's friends) in those two cars.

121.    Kidd and Gray had packed almost all of their belongings into those two cars and were moving out of the apartment, on Valentine's Day as planned, and their friend Atkinson was helping with the move.

122.    Kidd and Gray were separated at the scene and transported to the KCPD Homicide Unit separately.

123.    Defendants conducted separate interviews of Kidd and Gray. Defendants Pruetting and Russell interviewed Kidd, and Defendant Thompson interviewed Gray.

124.    Kidd and Gray both truthfully told Defendants that they had been together throughout the morning into the afternoon, and their accounts were substantially similar, providing a credible alibi for the time of the murder.

125.    Defendants intentionally separated Kidd and Gray to prevent them from collaborating on a story. Nor could they otherwise because, when they were stopped by police, Kidd did not know he was a suspect.

126.    Kidd told Defendants Pruetting and Russell that he woke Gray up sometime before 11 a.m. Kidd's sister had borrowed his newer car, the Toyota Corolla, to go to work downtown at DST, a financial institution, and Kidd was left with the 1981 Oldsmobile Delta. Because it was

cold that morning, he had trouble starting his 15-year-old car. Kidd then solicited the help of his

mother's boyfriend, Lawson Gratts.

127.    Once the car started, Kidd, Gray, and his nephew drove to Kidd's sister's office to pick

up the keys to the second car. Kidd and Gray then drove both cars back to their apartment.

128.    Kidd, Gray, and Kidd's nephew then set off to the Jackson County Sheriff's Office at

Lake Jacomo to obtain a gun permit, stopping at a McDonald's along the way.

129.    After the sheriff's office, Kidd and Gray drove with Kidd's nephew to the house of the

mother of Kidd's daughter.

130.    Defendant Thompson's report of Gray's interview omitted a number of details Gray had

provided to the police regarding her and Kidd's activities that day, including that Kidd was at the

DST office sometime between 11 a.m. and 12 p.m.—the time of the crime. Defendant

Pruetting's report of Kidd's interview also does not include the time Kidd arrived at the DST

office.

131.    Kidd was eager to clear his name and show Defendants that he had nothing to do with

this crime. He granted the police consent to search his two cars, which contained nearly all of his

belongings, including all of his clothing, as he and Gray were moving out of their apartment

when they were stopped by the police.

132.    Defendants also collected several pairs of Kidd's shoes and determined that none of

Kidd's shoe prints matched any of the items gathered from the crime scene, including the bloody

shoe impressions, or footprints, left at Bryant's house.

133.    Kidd agreed to be fingerprinted.

134.    He also volunteered to stand in a videotaped lineup. Defendant Thompson and Detective Guffey recorded a videotaped lineup that included Kidd and only three fill-in subjects, to be shown to witnesses at a later time.

135.    As with the "mug" show up folder Defendants used throughout the investigation, this videotaped lineup was also suggestive. As the habeas court noted, Kidd's "line-up does not contain enough fillers; the recommendation from the American Psychology Law Association is to have at least 6 people in an individual line-up."

136.    Although Kidd cooperated with Defendants in demonstrating his innocence, out of reasonable fear of violent Goodspeed Sr., he did not, at that time, volunteer the information he had implicating the Goodspeeds.

**The KCPD gather evidence connecting the Goodspeeds and Marcus Merrill to the crime.**

137.    Defendants' working theory of the crime was that three Black men together committed this double murder and fled in a white four-door vehicle that was clean—suggesting the suspect vehicle was a new and/or rental car. And Defendants quickly developed information about these three men.

138.    Specifically, the police learned that the Goodspeeds flew to Kansas City from Atlanta on the evening of February 1—five days before the crime—and returned on February 9—three days after the crime.

139.    The police learned that the Goodspeeds stayed at a Ramada Inn and then later at the Adam's Mark Hotel with Merrill, who rented two rooms on February 2, 1996, and a third room on February 4, 1996.

140.    The police learned that Goodspeed Sr. rented a white, four-door 1995 Oldsmobile Cutlass Ciera from Alamo Rent-a-Car on February 1, returned the car on February 9, and paid $550.40 in cash.

141.    The police learned there was blood on the interior driver's door and the trunk mat of Goodspeed Sr.'s rental car. The blood on the interior driver's door was later confirmed to not match either victim. (In contrast, Defendants found no blood in Kidd's Oldsmobile Delta.)

142.    The police learned that Merrill, who had rented the rooms for the Goodspeeds, checked out of the Adam's Mark Hotel on the day of the crime.

143.    The police learned that the fingerprint found on a Carmex lip balm package found in the rental car was a match to Goodspeed Sr.

144.    The police also learned that the price sticker on the Carmex lip balm package was from a "Good To Go" convenience store. The police determined there were only four "Good To Go" convenience stores located in the greater metropolitan Kansas City area, and that one store was approximately one block from Bryant's residence.

145.    Between mid-February and March, Defendants had developed evidence about three Black men—the Goodspeeds and Merrill—who not only fit their theory of the crime, but whose travel and rental plans bookended the date of the crime.

### Richard Harris falsely identifies Ricky Kidd from a videotaped lineup.

146.    In the early stages of the investigation, including on the day of the crime, Defendants received multiple anonymous calls naming Richard Harris as a person with information, either because he participated in the crime, had a connection to the participants, or because he was a witness.

24

147.    Harris is a habitual liar. He has admitted to lying to the police numerous times, including at trial and in post-conviction proceedings.

148.    Over the past 25 years, he has provided wildly inconsistent stories of what happened the morning George Bryant and Oscar Bridge were murdered.

149.    Harris is and has always been a completely incredible and unreliable witness.

150.    He used drugs almost every day, including hard drugs such as PCP, and also dealt drugs, including purchasing and selling drugs from Bryant on the day he was murdered. In fact, during this investigation, Harris was on parole for selling drugs to an undercover police officer.

151.    Harris was also seeking benefits for any information provided about the crimes, in the form of reward money and/or having his charges released or dropped.

152.    In the days after the crime, Harris called Al Brooks, a former KCPD officer and founder of the Ad Hoc Group Against Crime, a victims' advocacy and community group that works closely with the police, and they discussed reward money. The Ad Hoc Group was known to police and civilians to provide reward money to individuals who provided information through the TIPS Hotline.

153.    Though police would soon develop evidence pointing to the Goodspeeds and Merrill, during these early stages of the investigation, it was unclear whether Harris was a witness or a suspect, though Harris believed he was a suspect.

154.    An anonymous call on the day of the crime stated that Harris had witnessed the shooting and knew the shooters because he had dealt drugs with them in the past.

155.    Harris reported to Defendants that he ran to Cleveland Health Care, a nearby nursing home, after the shooting. An employee reported she saw a man with blood on his shirt run into the nursing home and say to someone in the lobby, "I chickened out," which suggested he may

have been more involved than as a witness. Defendants did not ask her to view photographs or otherwise identify this man; during post-conviction investigation, however, she later identified him as Richard Harris.

156. After searching for Harris for several weeks, on March 11, 1996, Defendants Russell and Thompson were notified that Harris was being held in jail on other warrants.

157. Despite the ambiguity surrounding Harris and his involvement, according to Defendant Russell, Defendants were "only interested in getting [Harris] to help out with this specific incident" as a witness.

158. Defendants Russell and Thompson removed Harris from the Detention Unit and interviewed him.

159. Harris provided an alleged account of witnessing the crime that was implausible on its face and wildly inconsistent with the consistent accounts detectives had received from other witnesses.

160. For example, Harris incorrectly described both suspects as wearing colorful clothing and failed to describe outerwear for one of the suspects—though the crimes took place on a cold day in early February; other witnesses consistently and accurately described all suspects as wearing black coats.

161. Harris incorrectly described the suspect vehicle as a white Nissan, among other things; other witnesses consistently and accurately described the suspect vehicle as a white Oldsmobile.

162. Harris incorrectly stated that the suspect vehicle was parked in the driveway; other witnesses consistently described the suspect vehicle as parked on the street across Bryant's house.

163.	Harris incorrectly described the suspect vehicle as exiting southbound on Cleveland Avenue; other witnesses consistently describe the suspect vehicle exiting northbound on Monroe Street.

164.	Harris described to Defendants an alleged dramatic escape from the crime scene. He claimed that after one of the shooters started chasing him, Harris ran to a friend's house, and then jumped over a fence to run to a nearby gas station. Neighbors who witnessed the crimes—even those who could not describe the shooters but who identified people in the surrounding areas—did not name Harris among the individuals they saw outside.

165.	Defendants Russell and Thompson then reportedly showed Harris the improperly suggestive "mug" show up folder which had at least four suspects and few wrong answers.

166.	Harris allegedly stated subject #5—Ricky Kidd—"definitely looked like" the second suspect who came out of George Bryant's house after the first suspect tackled Bryant in the driveway.

167.	Defendants Russell and Thompson then showed Harris the improperly suggestive videotaped lineup that included Kidd.

168.	The detectives reported that Harris picked out position #1—Ricky Kidd—as the second suspect he saw exit Bryant's house.

169.	Defendants Russell and Thompson then conducted a videotaped interview of Richard Harris.

170.	During Harris' videotaped statement, Thompson questioned Harris about his previous off-tape identification of Kidd, and Harris confirmed his identification.

171.	Harris provided an account of how he allegedly recognized Kidd that was obviously unreliable. He told Defendants he named the shooter the "Terminator" because of his slow walk,

and the sole basis Harris provided for his identification of Kidd from the videotaped lineup was his walk. According to Harris, Kidd "walked a little slower but he still had a duefuss [sic] like walk[.]"

### The KCPD purposefully and recklessly investigate Richard Harris' false and fabricated story.

172.    Beyond numerous, obvious inconsistencies between Richard Harris' account of the crime, and what Defendants had learned from other witnesses' consistent accounts of the crime, Defendants had several reasons to question Harris' credibility, and therefore his identification of Ricky Kidd.

173.    Harris was picked up on a warrant which Defendants knew or should have known was for drug dealing, an investigative red flag given that Bryant was a known drug dealer.

174.    Defendants also knew or should have known that Harris would have been interested in leniency on his charges, given he had been arrested, and therefore was motivated to provide any information, including false evidence.

175.    In fact, Harris could not have been clearer about his interests. During his videotaped statement, Harris told Defendants the reason he did not come forward with this information was because he had a parole violation. He added "And, I don't want to go back to jail."

176.    Defendants knew or should have known that Harris believed he was a suspect in Bryant's murder.

177.    In short, Defendants knew or should have known that Harris was a wholly unreliable and motivated witness.

178.    Defendants therefore had several reasons to investigate Harris' false and fabricated story, starting with where he was before and after he allegedly witnessed the shooting.

179.     Harris told Defendants he went to his friend Michael Holland's house at 9:00 a.m. the morning of the crime, he left at about 11:25 a.m. as the *Young and Restless* was ending, and that he did not see George Bryant at all before he was shot. He also told Defendants he ran back to his friend Holland's house and "bammed" on Holland's door to no answer.

180.     Despite Harris' detailed account of Holland's role in Harris' witness account, Defendants failed to interview Holland to confirm or deny Harris' story.

181.     Because Defendants did not interview Holland, they failed to learn what he would later say under oath at Kidd's 2009 federal habeas corpus hearing: that Richard Harris was at his house getting high on marijuana or some other illegal substance on the morning of the double murder. Although Harris told Defendants he walked up the street at 9:00 a.m. that morning, Holland testified that Harris had only been there for thirty minutes before he left at 11:30 a.m.

182.     Because Defendants failed to interview Holland, they did not investigate Harris' whereabouts for the ninety minutes missing from his story, and did not learn what was later revealed in 2019, that Harris had received an eight ball of crack cocaine from George Bryant, took it home to cut it into individual hits, and delivered them to several buyers on the morning of the crime.

183.     Defendants also failed to conduct interviews of the numerous other people Harris claimed to have spoken to about the crime or who Harris mentioned in his description of the crime.

184.     For example, Harris told Defendants that Earl "Speedy" Ramsey was outside working on his car two houses up from Bryant's house at the time of the shooting and saw the whole thing. Defendants never interviewed Ramsey.

**Over two months after the crime, the KCPD fabricate that four-year-old Kayla Bryant identified Ricky Kidd from a videotaped lineup.**

185.    On April 11, 1996, Connie and Kayla Bryant arrived at the Homicide Unit, where Defendant Thompson re-interviewed Kayla with her mother present.

186.    Even though within days of the crime Kayla had viewed a photo of Ricky Kidd and stated unequivocally that she did *not* recognize him as one of the perpetrators, and even though Kidd had given a detailed and credible alibi for the time of the crime, detectives reported that, two months later, Kayla Bryant was shown the videotaped lineup of Kidd and only three other Black males. Ricky Kidd was the only person in the lineup whom Kayla had previously seen in the suggestive "mug" show up folder.

187.    Connie, Defendants David Bernard, George Barrios, Ronald Russell, Jay Pruetting, and Jay Thompson, as well as another detective, were reportedly present in the squad room where Kayla viewed the videotaped lineup.

188.    Defendants did not video record Kayla's alleged viewing of the videotaped lineup.

189.    Defendant Thompson later falsely reported that Kayla made a compelling and theatrical identification of subject #1, Ricky Kidd, as he walked across the room and stood facing the camera, claiming that Kayla turned to her mother, and stated, "That's him."

190.    This report of Kayla's alleged identification of Kidd from the videotaped lineup is false and fabricated. Kayla had not seen Kidd on the day of her father's murder because he is innocent and was not there. As Kayla accurately told the detectives during her initial interview four days after the murder—and as she would later repeat in open court—she did not recognize Kidd and would not identify him as one of the men in her house when her father was killed.

191.    Indeed, Kayla never identified Kidd in *any* manner in a proceeding that was recorded in any way, either by video or audio recording or in open court as captured by a court reporter.

192.   Furthermore, an hour after the alleged videotaped lineup showing, Defendants Thompson and Russell conducted a 17-minute videotaped interview of Kayla Bryant, who sat on her mother's lap during the interview.

193.   Although it would be expected if she had actually made an identification of Kidd from the videotaped lineup (let alone the compelling, definitively positive identification officers attributed to her) that the identification would have been referenced in some way in the video interview, no mention is made of this alleged identification purportedly made minutes earlier.

194.   By contrast, when Defendants Thompson and Russell conducted a videotaped interview with Richard Harris after his tentative identification of Kidd from the "mug" show up folder and the subsequent identification of Kidd from a videotaped lineup, they asked Harris about both identifications on tape and in that way preserved a record that Harris had in fact made an identification.

195.   The videotaped interview with Kayla provides contemporaneous evidence of Kayla's demeanor and state of mind at the time Defendants report that she made this compelling, definitively positive, and theatrical identification of Ricky Kidd—and it is completely inconsistent with the way Defendants claim Kayla behaved minutes earlier.

196.   As the state habeas court found: "She is clearly tired, hungry, and her attention span is short. The questions are pointed, leading and suggestive. She at times provides nonsensical answers, and at other times adopts answers suggested to her."

197.   During her videotaped interview, Kayla said, "I am crazy," "I forgot the story," and "I forgot the whole story."

198.    As Defendant Russell has twice testified in deposition and at the evidentiary hearing for Kidd's state habeas proceeding, if an identification had been made, he would expect it to be preserved in the video interview that took place after.

199.    The alleged compelling, theatrical, unequivocally positive identification of Ricky Kidd from the videotaped lineup never occurred. Either Kayla never identified Kidd at all from the videotaped lineup, or any identification occurred under circumstances which clearly demonstrated it was unreliable, such as that Kayla's demeanor and conduct demonstrated she was providing nonsensical answers (as it did on the videotaped interview shortly thereafter) or any identification was only the result of suggestion and leading.

200.    Defendants fabricated a report about Kayla's alleged identification and provided this report to lead prosecutor Amy McGowan. Defendant Thompson also told McGowan about Kayla's alleged identification.

201.    McGowan relied upon Defendants' fabricated written and verbal reports of Kayla's alleged identification as the key basis for Kidd's prosecution and conviction.

202.    Because Kayla did not see Kidd at any point on the day of the crime, at trial she did not identify Kidd, who was seated in the courtroom, when McGowan repeatedly, and in increasingly leading fashion, asked Kayla whether she could "see either of those two men that were at your house that day with [her] daddy."

203.    And because Kayla never identified Kidd at all from the videotaped lineup or because any identification she made was under circumstances which clearly demonstrated it was unreliable to all present including her, she stated she did in fact watch a videotaped lineup but did not answer McGowan's question about whether she selected someone from a videotaped lineup.

204.    Unable to obtain an in-court identification of Kidd from Kayla and relying on

Defendants' pretrial reports about Kayla's alleged identification, McGowan put on false

evidence from Defendant Thompson about the compelling, theatrical, unequivocally positive

identification of Kidd that Kayla allegedly made.

**The KCPD purposefully fail to collect and test evidence that would have exculpated Ricky Kidd and inculpated the Goodspeeds and Marcus Merrill.**

205.    Because the Goodspeeds and Marcus Merrill flew back to Atlanta after committing their

crimes, the KCPD worked with local police to search the Goodspeeds' and Merrill's Georgia

residences.

206.    In April 1996, based on information received from Defendant Thompson, DeKalb

County Police Department detectives obtained a search warrant for the residence of Goodspeed

Jr. and Merrill in Decatur, Georgia.

207.    Defendants understood the critical investigative value of shoes in this case. Bloody

footprints had been discovered at the scene. Defendant Pruetting testified he understood this

evidence to suggest that "potentially the shooter of Oscar Bridges [whose blood was found on at

least one of the footprints] would be one possibility for that footprint[.]" To this end, Defendants

had previously collected several pairs of Kidd's shoes for testing, and they would later learn

none of his shoes matched the footprints.

208.    Yet Defendant Bernard, who was the detectives' supervisor, signed off on Defendant

Thompson's report stating that the DeKalb County Police Department had searched Goodspeed

Jr.'s and Merrill's residence and sent Defendant Thompson "numerous jackets and baseball style

hats, along with numerous pieces of paper," but not a single pair of shoes.

209.     As the state habeas court found: "If shoes had been collected, they could have been compared to the footprints at the scene of the crime, and they could have been tested for traces of blood that could be compared to the bloody footprint found in the victim's kitchen."

210.     None of this was done.

### The KCPD purposefully fail to investigate Goodspeed Sr.'s and Marcus Merrill's statements.

211.     On February 29, 1996, Goodspeed Sr. called KCPD headquarters and was interviewed by Defendant Kent Morton. Goodspeed Sr. told Defendant Morton he and his son Goodspeed Jr. had flown from Atlanta to Kansas City on February 2 and returned to Atlanta days later. He also confirmed he and Jr. had stayed with Merrill at the Adam's Mark Hotel.

212.     Several weeks later, on April 4, 1996, Marcus Merrill was taken into custody, where Defendants Thompson and Russell questioned him for over two hours. Merrill confirmed he had stayed at the Adam's Mark Hotel with Goodspeed Sr. and was with Goodspeed Jr. on the day of the crime.

213.     Between these two interviews alone, Goodspeed Sr. and Merrill had placed themselves together with Goodspeed Jr. on the day of the crime. They also confirmed what Defendants knew: the Goodspeeds and Merrill traveled to Kansas City days before the crime, left days after the crime, and also stayed with each other during their time in the city. Any reasonable detective would have fully investigated any statements these suspects made to the police.

214.     Yet Defendants failed to take even the most basic investigative steps. For example, Merrill told Defendants that he stayed with Eugene Williams at 4404 Myrtle Avenue and Defendants' investigative report listed Williams as Merrill's "associate."

215.     Williams could have provided an independent account of Merrill's activity in the lead up to the crime. Defendants, however, purposefully failed to interview Williams.

34

216. Williams would later testify at Kidd's federal habeas corpus hearing—consistent with Merrill's sworn testimony—that he did actually spend the morning of February 6, 1996, with the Goodspeeds and Merrill at 4404 Myrtle Avenue, and that the Goodspeeds and Merrill had discussed their plan to rob someone.

217. Williams also testified that when the Goodspeeds left, Goodspeed Sr. was armed with a .45 automatic with a gold barrel, Goodspeed Jr. was armed with Williams' .38 caliber revolver that did not work, and Merrill was armed with a 9mm Glock.

218. Williams had accurately described the guns the Goodspeeds and Merrill used to commit their crimes, as ballistics investigations confirmed that both victims were shot with a .45 caliber bullet (from Goodspeed Sr.'s gun). A spent 9mm shell casing was also found in the garage (from the shot Merrill fired in the wall after Goodspeed Sr. told Merrill he "needed to do something about" four-year-old eyewitness Kayla).

**Concerned about the police investigation, Ricky Kidd begins to share more information about the Goodspeeds' involvement.**

219. Out of fear of the Goodspeeds, Kidd was not entirely forthcoming with police in the early stages of the investigation. Although he truthfully described his own innocence, he initially failed to volunteer the information he had implicating the Goodspeeds. He hoped the police would do their job and catch the real killers without putting him at risk by making him a witness.

220. But as it became increasingly apparent later to Kidd that the police were ignoring the Goodspeeds, he and his family provided additional information about the crime to the police based on what Goodspeed Sr. had confessed to Kidd.

221. On May 22, 1996, Kidd was arrested and charged with the murders he did not commit. (Merrill was arrested the day before.) Defendants Morton and Pruetting interviewed him for a second time.

35

222.    Kidd truthfully and repeatedly denied that he was involved in the death of the victims.

223.    Defendant Morton reported that Kidd told detectives that he had been with his girlfriend on the day of the murder, that he was telling the truth, and that whoever identified him had confused him for someone else, possibly his uncle, Gary Goodspeed Sr.

224.    Defendants Morton and Pruetting questioned Kidd for over one hour, from 4:37 p.m. to 5:41 p.m., but produced only a one-page typed report each.

225.    Both reports omit detailed information Kidd provided about his alibi.

226.    Kidd and his family, despite their reasonable fear of the Goodspeeds, in particular of Goodspeed Sr., provided additional information about the Goodspeeds' involvement in the double murder.

227.    At some time after Kidd's arrest, Monica Gray made at least one anonymous phone call to the TIPS Hotline naming the Goodspeeds and Merrill as the true perpetrators.

228.    Desperate to prove his innocence, on June 5, 1996, Kidd, against the advice of his counsel, reached out to Defendant Pruetting from the Jackson County Jail, where he was incarcerated.

229.    Kidd told Pruetting he was innocent and that he had nothing do to with this crime.

230.    Despite his well-founded fear of retaliation, Kidd shared even more information about the Goodspeeds' involvement.

231.    Kidd truthfully explained that the true perpetrators were Gary Goodspeed Sr., Gary Goodspeed Jr., and Marcus Merrill, and that Goodspeed Sr. had called Kidd and confessed that the three men had killed the victims. Kidd explained to Pruetting that "he was scared for himself and his family and he thought the detectives would figure it out themselves."

**With Ricky Kidd and Marcus Merrill in custody, the KCPD purposefully ignore inculpatory evidence volunteered by the Goodspeeds.**

232. Defendants, despite their failures to obtain inculpatory evidence, continued to receive information pointing to the Goodspeeds' involvement.

233. Defendant Thompson re-interviewed Marcus Merrill on May 21, 1996, after Merrill was arrested. On June 26, 1996, at the DeKalb Department of Public Safety in Decatur, Georgia, Defendants Barrios and Pruetting re-interviewed Goodspeed Sr., and, the next day, they interviewed Goodspeed Jr. for the first time.

234. During these interviews, and with months to prepare their story, the Goodspeeds provided Defendants the same alibi: Goodspeed Sr., Goodspeed Jr., and Merrill were with each at the time of the crime.

235. Goodspeed Sr. told detectives that Merrill and Goodspeed Jr. met Goodspeed Sr. at Sr.'s hotel room sometime between 11 and 11:30 a.m., after which the Goodspeeds and Merrill went to Sr.'s ex-wife, Jean Bynum's house, at around 12:15 p.m.

236. Incredibly, Goodspeed Sr. also told Defendants he had been to prison for manslaughter, and confessed that he did, in fact, commit that crime.

237. Though Goodspeed Jr. stuck to the false alibi the three had prepared in advance, stating all three went to Bynum's house, Jr. also provided Defendants critical inculpatory information: Jr. admitted that he went with Merrill to George Bryant's house on Friday, February 2, or Saturday, February 3, where he saw Bryant, Bryant's uncle, and another "dude" who was remodeling George's basement.

238. Kayla had previously told Defendants she saw the two men who shot her father in her house before the crime and that Bryant's uncle was present, and Kayla had already identified Merrill as one of those two men. Goodspeed Jr.'s bombshell admission now placed Jr. in

37

Bryant's home a few days before the crime with Merrill, whom Defendants had charged and arrested based on Kayla's identification.

239. Goodspeed Jr. also volunteered to Defendants that his father Goodspeed Sr. told him Bryant was killed at 11:45 a.m. Coincidentally, the first 911 call was made at 11:47 a.m.

240. Given that all three individuals were suspects named in numerous anonymous phone calls as having committed the crime, and that these three suspects had alibied each other, any reasonable detective would have taken steps to vigorously investigate this false alibi.

241. But Defendants failed again to take even the basic investigative steps they had used to investigate Kidd. For example, Defendants were aware of the physical evidence collected at the crime scene, which included bloody footprints, but they made no attempt, while in Georgia, to collect any shoes from the Goodspeeds and Merrill for testing.

242. Goodspeed Sr. and Merrill also told Defendants that they went to the home of Jean Bynum sometime after 12 p.m. Bynum could have provided detectives with information about the Goodspeeds' and Merrill's whereabouts that morning, the clothing they were wearing, and the car they were driving. Indeed, Kidd specifically told detectives in May 1996 about "several rumors" he had heard about the case and that, if anyone had information, it would be Bynum, Goodspeed Sr.'s ex-wife.

243. Yet despite the fact that Defendant Morton had interviewed Bynum on February 12, 1996—and therefore had her address and contact information—Defendants purposefully failed to re-interview Bynum to corroborate the Goodspeeds' and Merrill's false alibi.

244. Importantly, not only did the Goodspeeds and Merrill—in separate statements to Defendants—place themselves in one another's company at the time of the murders, they all stated they never saw Kidd that day.

38

**The KCPD purposefully ignore evidence suggesting Ricky Kidd's innocence.**

245.    Ricky Kidd told Defendants that, on the day of the crime, he went to the Jackson County Sheriff's Department to apply for a gun permit.

246.    On May 30, 1996, Defendant Thompson contacted the Jackson County Sheriff's Department to request the time Kidd applied for a handgun transfer.

247.    Defendant Thompson received a faxed copy of Kidd's Application to Transfer Handgun dated "2/6/96" and an attached computer printout that listed "1347 hrs."

248.    According to the faxed application, dispatchers # 934 and # 937 checked Kidd's records.

249.    Rather than identify and speak to the dispatcher who checked Kidd's records at the Jackson County Sheriff's Department, on May 31, 1996, Defendant Thompson called Sergeant Michael Buffalow.

250.    Defendant Thompson reported that Buffalow said there was no way to know when Kidd brought his application to the sheriff's department, or even if Kidd brought the application to the department, as applications could be faxed, mailed, or brought in by someone else.

251.    Defendant Thompson never spoke to the dispatcher who actually checked Kidd's records, nor did Defendants seek to determine whether the sheriff's department had surveillance video.

252.    Kidd and his family continued to volunteer detailed information about Kidd's whereabouts the day of the crime.

253.    In her July 11, 1996, interview with Defendants Pruetting and Barrios, Nikki Kidd, Ricky Kidd's sister, truthfully told detectives she spent the night of February 5 with her son at Kidd's apartment because she had gotten into an argument with her roommate Yolanda Harris.

254.    Nikki further told detectives that Kidd arrived at the DST office around noon, came inside, got the car keys, and then left, spending around 5 to 10 minutes inside.

255. Defendants purposefully ignored this potentially exculpatory evidence and failed to interview Yolanda Harris or any DST employees, including Alana Wesley, who later testified she specifically remembered seeing Kidd at around 11 to 11:30 a.m. and telling her colleague "Hey, Nicky [sic], your brother's here."

256. Nikki specifically told Defendants Pruetting and Barrios that though there were no sign-in logs for her office, there may be security cameras outside the business.

257. Defendant Pruetting testified at the federal habeas corpus hearing that he asked Nikki about sign-in logs because he was "looking for corroboration evidence."

258. Nevertheless, and despite Nikki's reporting about surveillance video, as the state habeas court found: "Although DST was just a few blocks from police headquarters, no detective or officer attempted to collect and preserve the video that might have proven Kidd's innocence."

259. Here too, Defendants purposefully ignored potentially exculpatory evidence and failed to collect and preserve surveillance video.

**The KCPD purposefully fail to show Kayla Bryant photographs and videotaped lineups of the Goodspeeds.**

260. Despite the mountain of evidence pointing to the Goodspeeds, Defendants did not show Kayla photographs or videotaped lineups of the Goodspeeds that were in their possession.

261. While in Georgia, Defendants Barrios and Pruetting conducted a videotaped lineup that included Goodspeed Sr. and Jr. and four other Black men.

262. On July 23, 1996, Defendant Pruetting showed Richard Harris the videotaped lineup with both Goodspeeds, and Harris identified Goodspeed Jr. as one of the suspects.

263. Defendants either failed to show Kayla the Goodspeeds' videotaped lineup or they did show her this videotaped lineup and failed to report the results.

40

264. Defendants also had at least one photograph of Goodspeed Sr. that they showed to some witnesses: as early as February 16, 1996, Defendant Pruetting and Detective Guffey showed Alamo Rent-A-Car employees a photograph of Goodspeed Sr.

265. Defendants either failed to show Kayla Goodspeed Sr.'s photograph or they did show her his photograph and failed to report the results.

266. Connie Bryant told Defendants that the photograph of Goodspeed Jr. in the "mug" show up folder was not an accurate likeness.

267. Here too, Defendants either failed to show Kayla a more accurate photograph of Goodspeed Jr., or they did show her his photograph and failed to report the results.

268. Rather than show Kayla—a reliable witness who had provided an accurate description of the crime consistent with other witnesses and with no motivation beyond identifying the men who killed her father—these photographs and lineups, Defendants instead purposefully showed the photographs and lineups to non-witnesses or, inexplicably, to Richard Harris, an obviously unreliable and motivated individual.

**Ricky Kidd is wrongfully convicted based on an alleged out-of-court identification by a four-year-old witness and the in-court identification of a habitual liar.**

269. Ricky Kidd was tried jointly with co-defendant and true perpetrator Marcus Merrill.

270. The Goodspeeds were never tried or even charged for their crimes. Despite the mountain of evidence pointing to Goodspeed Sr.'s involvement and the Defendants' theory that three men—not two—were involved, lead prosecutor Amy McGowan testified at Kidd's state habeas corpus hearing that he was "never presented to [her] as a defendant." And because the KCPD intentionally and recklessly failed to develop evidence inculpating the Goodspeeds, there was insufficient evidence to charge either Goodspeed Sr. or Goodspeed Jr. with the crimes they had committed.

41

271.   Four-year-old Kayla Bryant testified at trial. Kidd and Merrill were seated in the courtroom.

272.   Kayla testified that she was shown pictures and selected #3—Marcus Merrill—as the "fat guy." She also testified that she "didn't pick out the skinny guy" because he was not in any of the pictures.

273.   Consistent with her negative identification of Kidd in the days after the crime, when asked, Kayla did not identify Kidd as one of the suspects present at her house the day her father was killed.

274.   Prosecutor McGowan tried to get four-year-old Kayla to identify Kidd in court, including by asking increasingly leading questions. But Kayla would not identify him.

275.   McGowan asked her:

> Q: Can you look around and do you see either of those two men that were at your house that day with your daddy?
> A: No.
> Q: You don't see them? You don't see them here?
> A: No.
> […]
> Q: I'm going to ask you to look around again. Do you see anybody here that might have been at your house that day?
> A: No.

276.   McGowan attempted to obtain an in-court identification from Kayla by other means, including by having Kayla recall and testify to the videotaped lineup. But despite the prosecutor's repeated attempts, Kayla did not identify Kidd in court, nor did she testify that she ever identified him—because she did not. As the state habeas court found, Kayla's "only sworn testimony in the record is that Kidd is not one of the men who shot her father."

277.   Unable to secure an in-court identification from Kayla, which the state habeas court also found "suggests not just a failure to identify, but an exclusion of Kidd as one of the perpetrators

she saw in her home," McGowan presented false and fabricated evidence from Defendant Thompson of the alleged identification Kayla made from the videotaped lineup.

278. Richard Harris testified to his out-of-court identifications and falsely identified Kidd in court. The trial prosecutor stated that Harris had also identified Goodspeed Jr., who was not a defendant.

279. The jury did not know that the Goodspeeds had threatened Harris. In the lead up to trial, police had notified Harris that Goodspeed Sr. was in Kansas City and intended to kill him.

280. Harris would later testify in 2019 that he stayed at a hotel in the weeks before trial at the police or prosecutor's expense, and McGowan confirmed that Harris was put up in a hotel.

281. The jury—and lead prosecutor McGowan—also did not know that Harris was on parole for drug dealing, or that he was high and dealing drugs for Bryant on the morning of the murders. Defendants did not investigate Harris' criminal background, or if they did, they did not provide this impeachment evidence to the prosecutor.

282. In her closing argument, Kidd's trial counsel called Harris an outright liar. She recounted in detail the numerous inconsistences in Harris' account of the crime he allegedly witnessed, pointed out his hostility on the witness stand, and emphasized that he only provided information to the police after he was in custody.

283. Harris was the only witness to identify Kidd in court. Despite the prosecutor's best efforts to present Harris as a Good Samaritan in a bad situation, the jury knew he was a parole absconder.

284. The prosecutor therefore relied on false and fabricated evidence presented by Defendant Thompson—which McGowan solicited based on Defendants' pretrial reporting about Kayla's alleged identification—to bolster Harris' credibility and his false identification of Kidd.

285.     McGowan argued in closing that Harris was credible because his testimony, and specifically his identification of Kidd, was consistent with Kayla's alleged identification: "[T]o say you can't believe him is ridiculous because everything he says is consistent with what Kayla says." She added, "Richard Harris identifies Ricky Kidd as the one who shoot George Bryant, March 11….Kayla Bryant, April 11, identified Ricky Kidd. You see the independent identification here?"

286.     Kidd truthfully maintained his innocence at trial and testified in his own defense. Merrill, who has since admitted he participated in the crime with Goodspeed Sr. and Goodspeed Jr., did not testify.

287.     Kidd also presented five alibi witnesses who testified consistently and credibly to his whereabouts throughout the day of the crime.

288.     Jackson County Sheriff Department Sergeant Michael Buffalow testified that Kidd might have sent his application on February 5, 1996, and that he also could have faxed or had someone else turn in his application rather than submit it in person.

289.     The prosecution relied on Buffalow's inaccurate testimony to argue to the jury that Kidd's alibi witnesses were "telling you the truth" but mistaken about the day.

290.     No physical or forensic evidence ever linked Kidd to the crime. The case against Kidd rested on a weak foundation: an alleged out-of-court identification by a four-year-old witness and an in-court identification by a parole absconder.

291.     As McGowan argued in her closing argument: "[I]f you believe Kayla Bryant and if you believe Richard Harris and their identifications of these two men, then we have proven the case beyond a reasonable doubt because those two witnesses establish all the elements there are in those instructions."

292.    On May 9, 1997, a jury convicted Ricky Kidd of two counts of first-degree murder and two counts of armed criminal action. He was sentenced to life without the possibility of parole for each count of first-degree murder, and to life imprisonment for each count of armed criminal action. Merrill was also convicted of two counts of first-degree murder and two counts of armed criminal action, and similarly sentenced.

### Ricky Kidd is exonerated.

293.    As the Missouri state court found in its decision granting Ricky Kidd habeas relief: "Kidd has consistently asserted his innocence from his very first interview with police[.]"

294.    After his conviction, Kidd filed a direct appeal. In 1999, the Missouri Court of Appeals affirmed his conviction.

295.    Months later, Kidd then filed a *pro se* motion under Missouri Rule 29.15 asserting his actual innocence and other arguments. He and his later appointed public defender were successful in challenging his prior offender status, and Kidd was resentenced to life imprisonment without the possibility of parole on both first-degree murder counts, after the two counts of armed criminal action were dismissed.

296.    Kidd began to uncover additional evidence that the KCPD purposefully ignored or otherwise failed to develop during their investigation.

297.    In 2007, Kidd filed a petition for writ of habeas corpus in the U.S. District Court for the Western District of Missouri outlining this new evidence.

298.    In 2008, Merrill signed a sworn affidavit confessing to his role in the crime: he and the Goodspeeds had planned to rob George Bryant, Goodspeed Sr. shot Oscar Bridges, he and Goodspeed Sr. had shot Bryant, with Goodspeed Sr. shooting Bryant after Goodspeed Jr. tackled him outside.

45

299.    Merrill was clear: Ricky Kidd was not present or involved in the murders of Bryant and Bridges. Indeed, Merrill has never provided a different statement, including during the initial police investigation, when he told Defendants that he never saw Ricky Kidd in February 1996.

300.    In 2009, Merrill testified at Kidd's federal habeas corpus hearing, again describing his participation in the crime and affirming Kidd's innocence.

301.    Merrill did not testify at his own criminal trial. He explained: "I'm stepping forward because…I had a change of heart and I believe an innocent man shouldn't be locked up for something he didn't do. And…I believe it's time to correct the wrong and make it right."

302.    The district judge said during trial that Merrill "impressed me as a pretty truthful witness." The state habeas court later found that Merrill's "sworn confession, given in open court" was credible.

303.    Eugene Williams also testified at Kidd's 2009 federal habeas corpus hearing.

304.    Williams' testimony was consistent with Merrill's description of what happened the morning of the crime—the Goodspeeds met Merrill at Williams' home that morning and they had discussed robbing someone. Ricky Kidd was not present.

305.    Also, in 2009, Michael Holland testified that Richard Harris was high on drugs the morning of the double murder and had likely dealt drugs with Bryant that morning. He added that he did not see Harris on the street when he walked outside after the shooting.

306.    Despite this evidence, in particular from two witnesses Defendants knew about but did not interview during their investigation, the district court denied Kidd's petition, and the Eighth Circuit panel affirmed.

307.    As the state habeas court later explained: the federal district court "was not unsympathetic to Kidd's position. During the hearing, the district judge observed that the

'tragedy is that the Goodspeeds, and particularly of the Senior,...if he's getting off free, it would be terrible[,]'" but "the district court denied Kidd's...petition because the Eighth Circuit standard is uniquely preclusive."

308.    In 2015, Kidd filed a motion for post-conviction DNA testing in state court to prove his actual innocence. Kidd also filed a petition for writ of habeas corpus in state court.

309.    The state habeas court made a number of findings about the police investigation and Kidd's innocence.

310.    The court reviewed the 2007 deposition testimony of Susan Jordan—the police dispatcher at the Jackson County Sheriff's Department who checked Kidd's records for his gun permit application. Jordan confirmed that Kidd's application would have been submitted and received sometime before 1:47 p.m. on February 6, as Kidd and Gray truthfully told Defendants.

311.    The court found that Jordan's testimony confirmed that Kidd's gun permit application was received on the day of the crime before 1:47 p.m., providing "substantial, independent corroboration of Gray's testimony that she was with Kidd when he drove to the Sheriff's office in the late morning of February 6, 1996, to apply for a gun transfer permit."

312.    The court also found that Richard Harris was a habitual liar and that his identification of Kidd was wholly unreliable. His various statements to the police, trial testimony, hearing and deposition testimony over the years contained numerous inconsistencies and were contradicted by other credible evidence.

313.    Harris now recants his identification of Kidd, based on a conversation he had with his former neighbor, Earl "Speedy" Ramsey, who saw the shooting and told Harris that Goodspeed, Sr., not Kidd, shot George Bryant. Given the numerous inconsistencies in Harris' statements, the

state habeas court found that "his recantation suggests that he has always been lying, or at the very least unsure."

314.   The court further found that Kayla's February 1996 statements to the police, including her positive photo identification of Merrill and negative photo identification of Kidd, predated the April 1996 interview and videotaped lineup procedure, which suffered from numerous deviations from standard or best practice.

315.   Specifically, the court wrote: "These [February 1996] statements and photo identification are trustworthy corroboration of Marcus Merrill's description of the crime, and Kayla's February 10 exclusion of Kidd as one of the suspects credibly supports Kidd's innocence."

316.   On August 14, 2019, Daviess County Associate Circuit Court Judge Daren Adkins granted the petition for habeas relief, vacated Kidd's convictions, and ordered a new trial.

317.   Kidd was finally released from custody on August 15, 2019, after over two decades of wrongful incarceration.

318.   On September 13, 2019, the Jackson County Prosecutor's Office dismissed the charges.

319.   Gary Goodspeed Sr. died before Ricky Kidd was exonerated.

320.   Ricky Kidd now brings this lawsuit to hold accountable the officers whose misconduct resulted in his wrongful conviction and in two killers, who destroyed the lives of three families—Kidd, Bryant, and Bridges—escaping justice for their crimes.

## DAMAGES

321.   The unlawful, intentional, willful, deliberately indifferent, and reckless acts and omissions of the individual Defendants, the City of Kansas City, Missouri, and the Board caused Kidd to be improperly arrested and imprisoned, unfairly tried, wrongfully convicted, and forced to serve 23 years in prison for crimes he did not commit.

48

322.     As a direct result of Defendants'[2] actions and omissions, Kidd sustained injuries and damages, including loss of his freedom for 23 years, loss of his youth, pain and suffering, mental anguish, emotional distress, indignities, degradation, permanent loss of natural psychological development, and restrictions on all forms of personal freedom including, but not limited to, diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and freedom of speech and expression.

323.     As a direct result of Defendants' actions and omissions, Kidd was deprived of his familial relationships, including his relationships with his four children. When Kidd was wrongfully convicted in this case, his daughter Raven was four years old, his daughter Jasmine was five years old, his son Austin was two years old, and his daughter Infiniti had not yet been born; when he was exonerated and released, Raven was 27 years old, Jasmine was 28 years old, Austin was 25 years old, and Infiniti was 23 years old.

324.     As a direct result of Defendants' actions and omissions, Kidd sustained economic injuries and damages, including loss of income and loss of career opportunities.

325.     As a direct result of Defendants' actions and omissions, Kidd sustained physical injuries and damages, including physical pain and suffering, personal injuries, physical illness, and inadequate medical care. Eighteen months after Kidd returned home, he suffered a heart attack resulting in triple bypass surgery.

---

[2] Throughout the Damages section, "Defendants" refers to all named Defendants.

# CAUSES OF ACTION

## COUNT I: 42 U.S.C. § 1983 Deprivation of Liberty without Due Process of Law and Denial of a Fair Trial by Fabricating Evidence and Withholding Material Exculpatory and Impeachment Evidence

*Against Individual Defendant Officers George Barrios, David Bernard, Kent Morton, Jay Pruetting, Ronald Russell, and Jay Thompson*

326.     Plaintiff incorporates by reference all of the foregoing paragraphs.

327.     The Individual Defendants, individually and in concert, fabricated false evidence to provide an identification of Ricky Kidd, suppressed exculpatory evidence related to his alibi, failed to investigate in a manner that shocks the conscience, and instead followed through with the unlawful prosecution of Kidd, thereby depriving Kidd of his right not to be deprived of liberty without due process of law.

328.     The Individual Defendants ignored clear evidence that Kidd was innocent, and rather than investigate suspects Gary Goodspeed Sr. and Gary Goodspeed Jr., intentionally and in bad faith set about to violate Kidd's due process rights.

329.     The Individual Defendants intentionally or recklessly ignored the inaccuracies and inconsistencies in Richard Harris' false story about what he allegedly witnessed and the Goodspeeds and Merrill's false alibis, and ignored inculpatory evidence pointing to the Goodspeeds, and instead fabricated evidence to support Kidd's conviction.

330.     The Individual Defendants intentionally or recklessly ignored these facts and in a manner that shocks the conscience. In particular, the Individual Defendants intentionally and/or recklessly:

      a.   Failed to investigate Richard Harris' false and fabricated story, including without limitation in the following manner:

i. Individual Defendants, including without limitation Defendants Ronald Russell and Jay Thompson who interviewed Richard Harris, failed to conduct interviews of the numerous other people Harris claimed to have spoken to about the crime or who Harris mentioned in his description of the crime, including without limitation Michael Holland and Earl "Speedy" Ramsey.

ii. Individual Defendants, including without limitation Defendants Ronald Russell and Jay Thompson who interviewed Richard Harris, failed to investigate Richard Harris' criminal background, or if they did, they failed provide this impeachment evidence to the prosecutor.

b. Fabricated that four-year-old Kayla Bryant identified Ricky Kidd from a videotaped lineup, including without limitation in the following manner:

i. Defendant Jay Thompson prepared a false and fabricated written report, which was provided to the trial prosecutor, that Kayla Bryant made a compelling and theatrical identification of subject #1, Ricky Kidd.

ii. Defendants David Bernard, George Barrios, Ronald Russell, Jay Pruetting, and Jay Thompson failed to report that either Kayla Bryant never identified Ricky Kidd at all from the videotaped lineup or any identification occurred under circumstances which clearly demonstrated the identification was unreliable or any identification was only the result of suggestion and leading.

iii. Defendants Jay Thompson and Ronald Russell conducted a 17-minute videotaped interview of Kayla Bryant and purposefully failed to ask questions about her alleged identification of Ricky Kidd.

51

c. Suppressed exculpatory evidence, including without limitation the following evidence related to Ricky Kidd's alibi.

    i. Defendant Jay Thompson omitted details from his written report of the February 14, 1996, interview of Monica Gray, including without limitation information about Ricky Kidd's alibi.

    ii. Defendant Jay Pruetting omitted details from his written report of the February 14, 1996, interview of Ricky Kidd, including without limitation information about Ricky Kidd's alibi.

    iii. Defendants Kent Morton and Jay Pruetting omitted details from their reports of the May 22, 1996, interview of Ricky Kidd, including without limitation information about Ricky Kidd's alibi.

d. Ignored evidence suggesting Ricky Kidd's innocence, including without limitation evidence developed from the following:

    i. Defendants Jay Pruetting's and Ronald Russell's interview of Ricky Kidd on February 14, 1996;

    ii. Defendant Jay Thompson's interview of Monica Gray on February 14;

    iii. Defendants Kent Morton's and Jay Pruetting's interview of Ricky Kidd on May 22, 1996;

    iv. A faxed copy of Ricky Kidd's Application to Transfer Handgun dated "2/6/96" and an attached computer printout listed "1347 hrs" that Defendant Jay Thompson received on May 30, 1996;

    v. Defendant Jay Pruetting's interview of Ricky Kidd on June 5, 1996;

<div style="margin-left: 2em;">

vi.    Defendants Jay Pruetting's and George Barrios' interview of Nikki Kidd on July 11, 1996; and

vii.    Forensic results that none of the shoes the KCPD collected from Ricky Kidd matched the bloody footprints at George Bryant's residence.

</div>

e.  Failed to investigate Ricky Kidd's innocence, including without limitation in the following manner:

<div style="margin-left: 2em;">

i.    Individual Defendants, including without limitation Defendants George Barrios, Kent Morton, and Jay Pruetting who interviewed Monica Gray, Nikki Kidd, and Ricky Kidd, failed to interview individuals able to corroborate Gray's and Kidd's and Nikki's statements.

ii.    Defendant Jay Thompson failed to identify and speak to the dispatcher who checked Ricky Kidd's record for his gun-permit application.

iii.    Individual Defendants, including without limitation Defendants Jay Pruetting and George Barrios who interviewed Nikki Kidd, failed to collect and preserve surveillance video from DST.

</div>

f.  Failed to investigate the Goodspeeds' and Marcus Merrill's statements, including without limitation in the following manner:

<div style="margin-left: 2em;">

i.    Individual Defendants, including without limitation Defendant Kent Morton who interviewed Jean Bynum on February 12, 1996, and later interviewed Gary Goodspeed Sr. on February 29, 1996, failed to re-interview Bynum to corroborate the Goodspeeds' and Merrill's false alibi.

</div>

ii. Individual Defendants, including without limitation Defendants Jay

Thompson and Ronald Russell who interviewed Marcus Merrill on April 4,

1996, failed to interview Eugene Williams, Merrill's associate.

g. Ignored inculpatory evidence regarding the Goodspeeds, including without limitation

in the following manner:

i. Individual Defendants, including without limitation Defendant Jay Thompson

who re-interviewed Marcus Merrill on May 21, 1996, and Defendants George

Barrios and Jay Pruetting who re-interviewed Gary Goodspeed Sr. on June 26,

1996, and interviewed Gary Goodspeed Jr. on June 27, 1996, ignored

inculpatory evidence connecting the Goodspeeds and Marcus Merrill to each

other and to the crime scene.

ii. Individual Defendants ignored inculpatory evidence regarding the

Goodspeeds' and Marcus Merrill's travel and hotel plans, and Gary

Goodspeed Sr.'s rental car.

h. Failed to collect and test evidence that was potentially exculpatory to Ricky Kidd and

potentially inculpatory to the Goodspeeds and Marcus Merrill, including without

limitation in the following manner:

i. Individual Defendants, including Defendant Jay Thompson on whose

information the DeKalb County Police Department obtained a search warrant

for the residence of Gary Goodspeed Jr. and Marcus Merrill in Decatur,

Georgia; Defendant David Bernard, who signed off on Defendant Jay

Thompson's written report stating that the DeKalb County Police Department

searched Goodspeed Jr.'s and Merrill's residence and sent the KCPD only

"numerous jackets and baseball style hats, along with numerous pieces of paper," but no shoes; and Defendants George Barrios and Jay Pruetting who traveled to Georgia to interview and conduct a videotaped lineup of Gary Goodspeed Sr. and Jr., failed to collect shoes from the Goodspeeds and Marcus Merrill to compare to bloody footprints found in George Bryant's house.

i. Failed to show Kayla Bryant photographs and videotaped lineups of the Goodspeeds, including without limitation in the following manner:

    i. Individual Defendants, including without limitation Defendant Jay Pruetting, who showed Alamo Rent-A-Car employees a photograph of Gary Goodspeed Sr., and Defendant George Barrios, who, with Defendant Jay Pruetting, conducted a videotaped lineup that included Gary Goodspeed Sr. and Jr., either failed to show Kayla Bryant Gary Goodspeed Sr.'s photograph and the Goodspeeds' videotaped lineup or did show her this photograph and/or videotaped lineup and failed to report the results.

    ii. Individual Defendants either failed to show Kayla a more accurate photograph of Goodspeed Jr., or they did show her his photograph and failed to report the results.

331.    The foregoing acts and omissions were deliberate, reckless, wanton, cruel, motivated by evil motive or intent, done in bad faith, and/or involved callous indifference to Kidd's federally protected rights. These acts were perpetrated while the Individual Defendants were acting in their official capacities and under color of state law.

332.     The truth of the Individual Defendants' fabrication of Kayla Bryant's alleged identification could not have been discovered by Kidd or his attorneys through the exercise of due diligence. The Individual Defendants not only lied at trial and created false written and verbal reports, but they concealed the existence of and/or failed to develop exculpatory evidence, including evidence pointing to the true perpetrators, and concealed the leading, suggestive, or improper tactics used on their witnesses.

333.     Had the Individual Defendants' fabrications and/or the material exculpatory and impeachment evidence known to them been disclosed, this evidence would have tended to prove Kidd's innocence and cast doubt on the entire police investigation and prosecution.

334.     As a direct and proximate result of the Individual Defendants' actions, Kidd was wrongly prosecuted, detained, and incarcerated for 23 years and suffered the other grievous injuries and damages set forth above.

### COUNT II: 42 U.S.C. § 1983 Malicious Prosecution in Violation of the Fourth and Fourteenth Amendments

*Against Individual Defendant Officers George Barrios, David Bernard, Kent Morton, Jay Pruetting, Ronald Russell, and Jay Thompson*

335.     Plaintiff incorporates by reference all of the foregoing paragraphs.

336.     The Individual Defendants, acting individually and in concert with malice and knowing that probable cause did not exist to prosecute Ricky Kidd for the double murder of George Bryant and Oscar Bridges, intentionally caused Kidd to be arrested, charged, and prosecuted for those crimes, thereby violating Kidd's clearly established right, under the Fourth and Fourteenth Amendments of the U.S. Constitution, to be free of prosecution absent probable cause.

337.    The Individual Defendants, acting individually and in concert, fabricated evidence, withheld and misrepresented exculpatory evidence, and failed to investigate in a manner that shocks the conscience, all of which resulted in an arrest and prosecution without probable cause.

338.    The Individual Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Kidd's clearly established constitutional rights. No reasonable officer in 1996 would have believed this conduct was lawful.

339.    The prosecution finally terminated in Kidd's favor on September 19, 2019, when the Jackson County Prosecutor's Office dismissed all charges.

340.    The acts and omissions by the Individual Defendants described in the preceding paragraphs were the direct and proximate cause of Kidd's injuries because the Individual Defendants knew, or should have known, that their conduct would result in the wrongful arrest, prosecution, conviction, and incarceration of Kidd.

### COUNT III: 42 U.S.C. § 1983 Claim for First and Fourteenth Amendment Violations of Rights of Access to Courts and Executive Clemency

*Against Individual Defendant Officers George Barrios, David Bernard, Kent Morton, Jay Pruetting, Ronald Russell, and Jay Thompson*

341.    Plaintiff incorporates by reference all of the foregoing paragraphs.

342.    Having secured Ricky Kidd's incarceration through fabrication of evidence, suppression of exculpatory evidence, and reckless investigation, the Individual Defendants had a clearly established affirmative obligation to come forward with the truth during each year that Kidd was wrongfully detained.

343. Instead, the Individual Defendants intentionally, or with reckless indifference, did not disclose their misconduct and Kidd's innocence, continuing to suppress the truth up until Kidd's exoneration in 2019.

344. The Individual Defendants' actions directly caused the false imprisonment of Kidd and the repeated denial of his post-conviction requests for release, as well as numerous other physical and bodily injuries as set forth above.

### COUNT IV: 42 U.S.C. § 1983 Civil Rights Conspiracy

*Against Individual Defendant Officers George Barrios, David Bernard, Kent Morton, Jay Pruetting, Ronald Russell, and Jay Thompson*

345. Plaintiff incorporates by reference all of the foregoing paragraphs.

346. The acts and omissions by the Individual Defendants described in the preceding paragraphs were the direct and proximate cause of Kidd's injuries because the Individual Defendants knew, or should have known, that their conduct would result in the wrongful arrest, prosecution, conviction, and incarceration of Kidd.

347. The Individual Defendants and others yet unknown agreed among themselves and others to act in concert to deprive Kidd of his clearly established constitutional rights as protected by the Fourth and Fourteenth Amendments, including his right not to be deprived of liberty without due process of law.

348. In furtherance of the conspiracy, the Individual Defendants engaged in and facilitated numerous overt acts in furtherance of the conspiracy, including, but not limited to, the following:

    a. Acting in concert to fabricate witness evidence to bolster the only evidence against Ricky Kidd, an unreliable identification by Richard Harris, including by fabricating that four-year-old Kayla Bryant identified Kidd from a videotaped lineup, and

58

deliberately ignoring and/or recklessly failing to investigate Richard Harris' false and fabricated story.

b. Acting in concert to suppress evidence demonstrating Kidd's innocence, including by deliberately ignoring and/or recklessly failing to investigate evidence suggesting Kidd's innocence.

c. Prior and subsequent to Kidd's arrest, charging, and indictment, deliberately ignoring and/or recklessly failing to investigate leads pointing to other suspects and corroborating Kidd's innocence, including by deliberately ignoring and/or recklessly failing to investigate the Goodspeeds' and Marcus Merrill's statements; deliberately ignoring and/or recklessly failing inculpatory evidence regarding the Goodspeeds; deliberately ignoring and/or recklessly failing to collect and test evidence that was potentially exculpatory to Kidd and potentially inculpatory to the Goodspeeds and Marcus Merrill; and deliberately ignoring and/or recklessly failing to show Kayla Bryant photographs and videotaped lineups with the Goodspeed.

349. As a direct and proximate result of the Individual Defendants' overt acts, Kidd was deprived of his constitutional rights; wrongly prosecuted, detained, and incarcerated for 23 years; and subjected to other grievous injuries and damages as set forth above.

**COUNT V: 42 U.S.C. § 1983 Failure to Intervene**

*Against Individual Defendant Officers George Barrios, David Bernard, Kent Morton, Jay Pruetting, Ronald Russell, and Jay Thompson*

350. Plaintiff incorporates by reference all of the foregoing paragraphs.

351. By their conduct and under color of state law, the Individual Defendants, acting within the scope of their employment with the KCPD, had opportunities to intervene on behalf of Ricky

59

Kidd to prevent his false arrest, malicious prosecution, false imprisonment, and deprivation of liberty without due process of law, but with deliberate indifference, declined to do so.

352. The Individual Defendants' failures to intervene violated Kidd's clearly established constitutional right to be free from unreasonable search and seizure and not to be deprived of liberty without due process of law as guaranteed by the Fourth and Fourteenth Amendments. No reasonable police officer in 1996 would have believed that failing to intervene to prevent the Individual Defendants from fabricating inculpatory evidence, withholding material exculpatory evidence, deliberately failing to conduct a constitutionally adequate investigation, and causing Kidd to be arrested and prosecuted without probable cause, were lawful.

353. The Individual Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Kidd's injuries. The Individual Defendants knew, or should have known, that their conduct would result in Kidd's wrongful arrest, prosecution, conviction, and incarceration.

## COUNT VI: 42 U.S.C. § 1983 Supervisory Liability Claim

*Against Individual Defendant Officer David Bernard*

354. Plaintiff incorporates by reference all of the foregoing paragraphs.

355. Kidd's wrongful arrest, confinement, prosecution, trial, conviction, and incarceration was caused by the unconstitutional action and inaction of Defendant David Bernard, acting in his individual capacity and under color of law.

356. Defendant David Bernard directly participated in the misconduct that resulted in Kidd's wrongful conviction, including, but not limited to, fabricating evidence. Specifically, Defendant Bernard was reportedly present in the squad room where Kayla Bryant viewed the videotaped lineup of Ricky Kidd. Defendant Bernard purposefully failed to report either that Kayla Bryant

60

never identified Ricky Kidd at all from the videotaped lineup or any identification occurred under circumstances which clearly demonstrated the identification was unreliable or any identification was only the result of suggestion and leading.

357.    Defendant Bernard knowingly refused to terminate the wrongful prosecution of Kidd, which, upon information and belief, he knew or should have known had been initiated based on fabricated evidence, and in spite of suppressed exculpatory information. As a result, Defendant Bernard knew or reasonably should have known that Kidd's constitutional rights to be free from unreasonable seizure and not to be deprived of liberty without due process of law would be violated.

358.    Defendant Bernard culpably failed to adequately train, supervise, an/or control his subordinates, including Defendants Barrios, Morton, Pruetting, Russell, and Thompson, who obtained and reported fabricated evidence, suppressed exculpatory information, ignored evidence suggesting Ricky Kidd's innocence, and recklessly or otherwise failed to investigate evidence pointing to the Goodspeeds and undermining Richard Harris' identification of Kidd.

359.    Defendant Bernard violated Kidd's constitutional rights by acquiescing in the deprivation of Kidd's constitutional rights by their subordinates, and by generally showing a reckless or callous indifference to Kidd's rights.

360.    Defendant Bernard's failure to train, supervise, and/or control his subordinates, his indifference to the actions of his subordinates, and his indifference to Kidd's rights, encouraged and permitted his subordinates to fabricate evidence, fail to document and to disclose exculpatory evidence, ignore evidence suggesting Ricky Kidd's innocence, and recklessly or otherwise fail to investigate evidence pointing to the Goodspeeds and undermining Richard Harris' identification of Ricky Kidd.

361.    The actions and omissions of Defendant Bernard caused Kidd to suffer the constitutional deprivations and grievous personal injuries and damages described above.

## COUNT VII: False Arrest under Missouri state law

*Against Individual Defendant Officers George Barrios, David Bernard, Kent Morton, Jay Pruetting, Ronald Russell, and Jay Thompson*

362.    Plaintiff incorporates by reference all of the foregoing paragraphs.

363.    The Individual Defendants, acting separately and in concert, individually and in their official capacities, did willfully, unlawfully, maliciously, and without probable cause or legal justification, cause Ricky Kidd to be confined for the double murder of George Bryant and Oscar Bridges.

364.    Kidd provided an alibi, which was corroborated by evidence and witnesses. The Individual Defendants therefore knew, or had reason to know, that Kidd was innocent, but nonetheless arrested, detained, and interrogated Kidd.

365.    The Individual Defendants engaged in this course of conduct without concern for or consideration of Kidd's perceived guilt or innocence, and for no purpose related to any legitimate prosecutorial concerns.

366.    As a direct and proximate result of Kidd's false arrest, he was wrongfully detained and incarcerated and served more than 23 years for crimes he did not commit, and suffered the additional physical, emotional, and pecuniary damages as described above.

## COUNT VIII: Malicious Prosecution under Missouri state law

*Against Individual Defendant Officers George Barrios, David Bernard, Kent Morton, Jay Pruetting, Ronald Russell, and Jay Thompson*

367.    Plaintiff incorporates by reference all of the foregoing paragraphs.

368.     The Individual Defendants, acting separately and in concert, individually and in their

official capacities, did willfully, unlawfully, maliciously and without probable cause or legal

justification, cause Ricky Kidd to be prosecuted, detained, and incarcerated for the double

murder of George Bryant and Oscar Bridges.

369.     Based on Kidd's alibi and exculpatory physical evidence, The Individual Defendants

knew, or should have known, that Kidd was innocent. Nevertheless, without probable cause, the

Individual Defendants caused the commencement of prosecution proceedings against Kidd. The

Individual Defendants' conduct was actuated without any proper motive and with malice because

the Individual Defendants knew that Kidd was not the actual perpetrator of the crime.

370.     Twenty-three years after Defendants maliciously caused the commencement of a false

prosecution against Kidd, the proceedings were terminated in Kidd's favor through his

exoneration on August 14, 2019, when Daviess County Associate Circuit Court Judge Daren

Adkins granted a writ of habeas corpus. Kidd was released from prison on August 15, 2019, 23

years after he was arrested for a crime he did not commit, and afterward all charges against him

were dropped.

371.     As a direct and proximate result of the Individual Defendants' malicious prosecution of

Kidd, Kidd was wrongfully detained and incarcerated and served more than 23 years for crimes

he did not commit, and suffered the physical, emotional, and pecuniary damages as described

above.

### COUNT IX: Abuse of Process under Missouri state law

*Against Individual Defendant Officers George Barrios, David Bernard, Kent Morton, Jay*
*Pruetting, Ronald Russell, and Jay Thompson*

372.     Plaintiff incorporates by reference all of the foregoing paragraphs.

373.    The Individual Defendants, acting separately and in concert, individually and in their official capacities, made an illegal, improper, perverted use of process, namely the arrest, investigation, and prosecution of Ricky Kidd for crimes that he did not commit.

374.    The Individual Defendants knew that the use of such process was neither warranted nor authorized because they knew, or had reason to know, that Kidd was innocent.

375.    As a direct and proximate result of the Individual Defendants' abuse of process, Kidd was wrongfully detained and incarcerated and served more than 23 years for crimes he did not commit, and suffered the additional physical, emotional, and pecuniary damages as described above.

## COUNT X: Intentional Infliction of Emotional Distress under Missouri state law

*Against Individual Defendant Officers George Barrios, David Bernard, Kent Morton, Jay Pruetting, Ronald Russell, and Jay Thompson*

376.    Plaintiff incorporates by reference all of the foregoing paragraphs.

377.    The Individual Defendants, acting separately and in concert, individually and in their official capacities, did intentionally, maliciously, and with reckless disregard and deliberate indifference to Ricky Kidd's rights, engage in extreme and outrageous conduct in connection with the unlawful arrest, interrogation, and prosecution of Kidd, including without limitation: failing to investigate the true perpetrators despite ample evidence of guilt, fabricating evidence against Kidd, and suppressing exculpatory evidence which would prove Kidd's innocence.

378.    The Individual Defendants, knowing that Kidd was innocent of the crimes, acted only to cause him extreme emotional distress, and in fact did cause Kidd severe emotional distress that resulted in bodily harm.

379.  The Individual Defendants' conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

380.  As a direct and proximate result of the Individual Defendants' joint and several extreme and outrageous behavior, Kidd was wrongfully detained and incarcerated and served 23 years, and suffered severe emotional distress for which he is entitled to damages.

## COUNT XI: Negligent Infliction of Emotional Distress under Missouri state law

*Against Individual Defendant Officers George Barrios, David Bernard, Kent Morton, Jay Pruetting, Ronald Russell, and Jay Thompson*

381.  Plaintiff incorporates by reference all of the foregoing paragraphs.

382.  The Individual Defendants, acting separately and in concert, individually and in their official capacities, realized or should have realized that their conduct involved an unreasonable risk of causing distress to Ricky Kidd.

383.  As a direct and proximate result of the Individual Defendants' joint and several unreasonable behavior, as noted throughout this Complaint, Kidd suffered emotional distress or mental injury that is medically diagnosable and sufficiently severe to be medically significant, for which he is entitled to damages.

## COUNT XII: Civil Conspiracy under Missouri state law

*Against Individual Defendant Officers George Barrios, David Bernard, Kent Morton, Jay Pruetting, Ronald Russell, and Jay Thompson*

384.  Plaintiff incorporates by reference all of the foregoing paragraphs.

385.  The Individual Defendants and others yet unknown agreed among themselves and others to act in concert with the unlawful objective of depriving Ricky Kidd of his constitutional rights

as protected by the U.S. and Missouri constitutions, including his right not to be deprived of liberty without due process of law and his right against self-incrimination.

386.     In furtherance of the conspiracy, the Individual Defendants engaged in and facilitated numerous overt acts in furtherance of the conspiracy, including, but not limited to, the following:

a.    Acting in concert to fabricate witness evidence to bolster the only evidence against Ricky Kidd, an unreliable identification by Richard Harris, including by fabricating that four-year-old Kayla Bryant identified Kidd from a videotaped lineup, and deliberately ignoring and/or recklessly failing to investigate Richard Harris' false and fabricated story.

b.    Acting in concert to suppress evidence demonstrating Kidd's innocence, including by deliberately ignoring and/or recklessly failing to investigate evidence suggesting Kidd's innocence.

c.    Prior and subsequent to Kidd's arrest, charging, and indictment, deliberately ignoring and/or recklessly failing to investigate leads pointing to other suspects and corroborating Kidd's innocence, including by deliberately ignoring and/or recklessly failing to investigate the Goodspeeds' and Marcus Merrill's statements; deliberately ignoring and/or recklessly failing inculpatory evidence regarding the Goodspeeds; deliberately ignoring and/or recklessly failing to collect and test evidence that was potentially exculpatory to Kidd and potentially inculpatory to the Goodspeeds and Marcus Merrill; and deliberately ignoring and/or recklessly failing to show Kayla Bryant photographs and videotaped lineups with the Goodspeed.

66

387. As a direct and proximate result of the Individual Defendants' overt acts, Kidd was deprived of his constitutional rights; wrongly prosecuted, detained, and incarcerated for more than 23 years; and subjected to other grievous injuries and damages as set forth above.

## COUNT XIII: Respondeat Superior under Missouri state law

*Against the City of Kansas City, Missouri; the Kansas City, Missouri Board of Police Commissioners; and Individual Defendant Members Mark Tolbert, Cathy Dean, Don Wagner, and Quinton Lucas under Principles of Respondeat Superior*

388. Plaintiff incorporates by reference all of the foregoing paragraphs.

389. The Individual Defendants were, at all relevant times, employed by the City of Kansas City, Missouri, the Board, and/or the KCPD, and were either members of the City of Kansas City, Missouri, the KCPD, and/or the Kansas City, Missouri Board of Police Commissioners.

390. Individual Defendants Officers were, at all times, acting within the course and scope of their employment with the City of Kansas City, Missouri, the Board, and/or the KCPD in that their actions were in furtherance of the investigation of the double murder of George Bryant and Oscar Bridges, which was the assigned responsibility of each of the Individual Defendants.

391. Accordingly, Defendants City of Kansas City, Missouri, the Kansas City, Missouri Board of Police Commissioners, and/or the members of the Kansas City, Missouri Board of Police Commissioners are liable as principals for all torts committed by their agents and employees.

**WHEREFORE**, Plaintiff Ricky Kidd prays as follows:

A. That the Court award compensatory damages to Plaintiff and against all Defendants, jointly and severally, in an amount to be determined at trial;

B. That the Court award punitive damages to Plaintiff, and against all individual Defendants in their individual capacity, in an amount to be determined at trial, that will deter such conduct by defendants in the future;

C.   For a trial by jury;

D.   For pre-judgment and post-judgment interest and recovery of Plaintiff's costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims; and

E.   For any and all other relief to which Plaintiff may be entitled.

Date: August 12, 2021                     Respectfully submitted,

                                          /s/ *Michael J. Abrams*
                                          Michael J. Abrams MO Bar #42196
                                          Alana M. McMullin MO Bar #71072
                                          Lathrop GPM LLP
                                          2345 Grand Boulevard, Suite 2200
                                          Kansas City, MO 64108
                                          (816) 292-2000
                                          michael.abrams@lathropgpm.com
                                          alana.mcmullin@lathropgpm.com

                                          Nick Brustin*
                                          Emma Freudenberger*
                                          Katie McCarthy*
                                          Neufeld Scheck & Brustin, LLP
                                          99 Hudson Street, Eighth Floor
                                          New York, NY 10013
                                          (212) 965-9081
                                          nick@nsbcivilrights.com
                                          emma@nsbcivilrights.com
                                          katie@nsbcivilrights.com
                                          *Attorneys not yet admitted to the Western
                                          District of Missouri; applications to practice
                                          pro hac vice forthcoming

                                          ATTORNEYS FOR PLAINTIFF
                                          RICKY KIDD

68